In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1722

NANCY LOVE,

*Plaintiff-Appellant,*

*v.*

NATIONAL CITY CORPORATION
WELFARE BENEFITS PLAN,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 07 C 50048—**Frederick J. Kapala**, *Judge.*

ARGUED OCTOBER 21, 2008—DECIDED JULY 23, 2009

Before RIPPLE, EVANS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Nancy Love worked for National City Corporation for twenty years before leaving due to health problems. After her physician diagnosed her with multiple sclerosis, Love applied for and received short-term disability benefits—and subsequently long-term disability benefits—through National City's Welfare Benefits Plan ("the Plan"). Three years after Love began

receiving disability benefits, the Plan administrator terminated her benefits, stating that she no longer fit the Plan's definition of "disabled." Love appealed the benefits-termination decision and the Plan denied her appeal. Love then sued the Plan under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, alleging that her disability benefits were terminated without sufficient explanation or medical support. The district court granted summary judgment for the Plan. Because the Plan did not adequately explain why it concluded Love was no longer disabled, we reverse the judgment of the district court with instructions to remand to the Plan administrator for further proceedings.

## I. Background

Nancy Love worked for National City for more than twenty years in a variety of positions including bank teller, teller supervisor, and technical-support analyst. She stopped working in August 2001 when she began experiencing fatigue, dizziness, and blurred vision. After her physician diagnosed her with multiple sclerosis, Love applied for and received short-term disability benefits for 26 weeks, the maximum period permitted under the Plan. When her short-term benefits ran out, Love applied for and received long-term disability benefits. She continued to receive long-term disability benefits from February 2002 until December 2005, when Liberty Mutual, the claims administrator for the Plan, informed her that she no longer met the Plan's definition of "disabled."

To receive disability benefits, claimants must meet the Plan's definition of "disabled." The Plan sets out two separate definitions of "disabled." One definition controls benefits for the first two years of disability, and the second, more stringent definition covers any remaining period of disability:

> The definition of *disabled* during the 26-week [short-term disability] period and the first 18 months you receive [long-term disability] benefits is that you cannot perform the duties of your particular job with National City or a job with equivalent duties and responsibilities . . . . After you have been disabled for two years (that is, you have received six months of short-term disability benefits plus 18 months of [long-term disability] benefits), the definition of *disabled* changes. The Plan Administrator must determine that your condition makes you unable to perform the duties of any other occupation for which you are, or could become, qualified by education, training or experience.

Phrased another way, a claimant is disabled under the first definition if she cannot perform her particular job; she is disabled under the second definition if she cannot perform *any* job—including one for which she could become qualified by additional education or training. If the recipient fails to meet the applicable definition, disability benefits terminate.

Liberty Mutual initially determined that Love qualified as "disabled" under the first definition. That definition controlled for the 26 weeks that Love received short-term

disability benefits and the first 18 months that she received long-term disability benefits. In August 2003, two years after Love began receiving benefits, the second definition of "disability" kicked in under the Plan. Liberty Mutual continued to pay Love benefits but did not reassess her eligibility under the new definition until 2005. At that time, it enlisted Dr. Jonathan Sands, its medical consultant, to assess Love's status under the second, more stringent definition of "disability." Dr. Sands reviewed Love's medical file, which contained reports and records from several treating physicians. He observed that while Love probably suffered from multiple sclerosis, she never suffered a documented clinical attack nor exhibited any documented clinical signs. He also noted that her neurologic examination was normal. Based on this information, Dr. Sands concluded that Love was not "disabled" under the Plan's second definition and that "no objective limitations in functional ability or capacity are noted." Liberty Mutual sent Dr. Sands's report to Dr. Regina Bielkus, Love's primary physician, and asked her to explain whether she disagreed with any portion of Dr. Sands's report. Dr. Bielkus did not respond to Liberty Mutual's inquiries. On December 14, 2005, Liberty Mutual informed Love that she no longer qualified for long-term disability benefits. The letter explained that Dr. Sands had reviewed her medical file and had found no objective data supporting Love's assertion that she had limited functional ability.

Love appealed the decision to the Claims Appeal Committee. As support for her continued eligibility, she submitted various new reports purporting to show ob-

jective limitations on her functional capacity to work. For example, she submitted a physical-therapy evaluation, a functional-capacity evaluation, and a vocational evaluation. Each report was prepared by a different doctor, and each report concluded that Love had limited functional ability. The Committee turned this new information, along with Love's complete medical file, over to Dr. Gerald Winkler for review. Dr. Winkler agreed with Dr. Sands's conclusion that Love was not totally disabled. Specifically, he concluded that Love remained able to "do a job that can be performed either seated or standing, that entails the use of a telephone, that entails the intermittent reference to a computer display or printed material without requirements of speed, and that requires conversation with members of the general public." The Committee denied Love's appeal, citing Dr. Winkler's conclusion that Love could perform a job with the listed functional limitations. Love subsequently sued the Plan under ERISA, claiming that the Plan did not consider all the relevant medical evidence and did not sufficiently explain its termination decision. The district court granted summary judgment in favor of the Plan, holding that the Plan both considered all the relevant evidence and sufficiently justified its termination decision.

## II.  Analysis

### A.  Standard of Review

We review a district court's grant of summary judgment de novo and view all facts in favor of the nonmoving party. *Tate v. Long Term Disability Plan Salaried Employees*,

545 F.3d 555, 559 (7th Cir. 2008). Because the Plan has discretion to determine an individual's eligibility for benefits, we review the Plan's decision to terminate Love's benefits under an arbitrary and capricious standard.[1] *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 773 (7th Cir. 2003). While this standard of review is deferential, it is not a rubber stamp, and "we will not uphold a termination [of benefits] where there is an absence of reasoning in the record to support it." *Id.* at 774-75. Furthermore, ERISA requires plan administrators to communicate specific reasons for a denial of benefits to the claimant and address any reliable evidence of eligibility put forward by the claim- ant. *See* 29 U.S.C. § 1133; *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). We will reverse a Plan's determination as arbitrary and capricious if it fails to

---

[1] We reject Love's suggestion that the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), "fundamentally altered the paradigm for adjudicating ERISA claims" by requiring us to conduct a more searching review. The Supreme Court in *Glenn* merely held that courts reviewing benefits determinations under ERISA should consider any conflict of interest that exists when a plan ad- ministrator both evaluates claims for benefits and pays those benefits. *Id.* at 2348. The Court explicitly disavowed any suggestion that it was altering the standard of review. *Id.* at 2350 ("We do not believe that *Firestone*'s statement implies a change in the *standard* of review . . . ."). We continue to apply an arbitrary-and-capricious standard to denial-of-benefits claims after *Glenn*. *See Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009).

substantially comply with these requirements. *Nord*, 538 U.S. at 834; *Tate*, 545 F.3d at 559.

## B. Sufficiency of Explanation

ERISA requires employee benefit plans that deny disability benefits to "set[] forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133. The accompanying regulations further require the plan to describe "any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(iii). These requirements are designed both to allow the claimant to address the determinative issues on appeal and to ensure meaningful review of the denial. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992). We will reverse any denial of benefits that does not substantially comply with these regulations. *Id.* at 693-94.

In this case neither the initial termination letter nor the subsequent letter denying Love's appeal sufficiently explained the denial. Both letters asserted that all relevant medical evidence had been considered, but neither letter explained *why* the reviewer chose to discredit the evaluations and conclusions of Love's treating physicians. *See id.* at 694. Liberty Mutual conducted the initial review, retaining Dr. Sands as an independent medical consultant. After reviewing Love's medical file, Dr. Sands concluded that Love was not totally disabled because there was no "objective" evidence that Love

suffered any functional limitations. However, Love's file contained numerous test reports indicating a reduced functional capacity, such as an MRI of her spine, evoked-response tests, several physical-capacity reports, and various lab reports. The file also contained several evaluations by Dr. Bielkus, Love's primary physician, opining that Love's functional limitations stemming from her multiple sclerosis made her unable to work. She concluded that Love was "medically disabled on a permanent basis from any form of gainful occupation." In fact, every doctor that personally examined Love concluded that she was unable to work more than a few hours a day and that she could not stand, sit, or walk for more than an hour at a time. Dr. Sands did not address any of these reports in his cursory report, which dedicated less than half a page to its analysis and recommendation. Liberty Mutual's termination letter merely recited the various items in Love's medical file in a bulleted list, stated that Dr. Sands had found no objective limitations in Love's functional ability, and terminated her benefits without any further discussion or explanation. We are troubled by the fact that neither Dr. Sands's report nor Liberty Mutual's letter addressed the contrary findings of Love's treating physicians or explained why Liberty Mutual chose to discredit them.

On appeal, Love submitted additional reports demonstrating her functional incapacity to the Plan's internal appeals committee. These reports showed that Love had significant impairments: She could not walk, sit, or stand for more than an hour at a time; she could only lift light items occasionally; she had limited flexibility,

serious vision impairments, and diminished muscular strength; and she experienced frequent spells of dizziness, vertigo, and fatigue. Dr. Winkler, who was retained by the Plan to review Love's file on appeal, noted these problems but concluded that Love could perform a job "either seated or standing, that entails the use of a telephone, that entails the intermittent reference to a computer display or printed material without requirements of speed, and that requires conversation with members of the general public." While acknowledging that Love could not perform her current job, Dr. Winkler concluded that Love was not totally disabled but did not adequately explain his conclusion. For example, Dr. Winkler noted Love's chronic fatigue but dismissed it by asserting that "there are medications that are used to treat fatigue." Additionally, Dr. Winkler noted that Love was limited to a six-hour workday. In fact, however, only one physical therapist had concluded that Love would be able to work for up to six hours; the rest of Love's treating physicians had concluded that she was limited to, at most, two or three hours of work each day. Dr. Winkler did not address the opinions of these other physicians.

These explanations are insufficient to meet ERISA's requirement that specific and understandable reasons for a denial be communicated to the claimant. *Halpin*, 962 F.2d at 688-89. As we have noted, "[b]are conclusions are not a rationale." *Id.* at 693. The Plan must provide a reasonable explanation for its determination and must address any reliable, contrary evidence presented by the claimant. *Nord*, 538 U.S. at 834 ("Plan administra-

tors, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); *see also Kalish v. Liberty Mut./Liberty Life Assurance Co.*, 419 F.3d 501, 510 (6th Cir. 2005) (holding that a plan acted arbitrarily in denying disability benefits when its medical consultant failed to rebut the contrary medical conclusions of the claimant's primary physician). The Plan did not explain why it chose to discount the near-unanimous opinions of Love's treating physicians. While plan administrators do not owe any special deference to the opinions of treating physicians, *see Nord*, 538 U.S. at 834, they may not simply ignore their medical conclusions or dismiss those conclusions without explanation. We do not hold that the evidence here *requires* a finding that Love is totally disabled, only that ERISA requires the Plan to provide a more thorough explanation for its determination than it has here. The Plan acted arbitrarily by terminating Love's benefits without sufficiently explaining its basis for doing so.

One final point bears a brief word. Love complains that the Plan's determination is suspect given the Social Security Administration's ("SSA") determination that she qualified for disability benefits. In 2002 the SSA determined that Love met its definition of "disabled" because of her multiple sclerosis and awarded her retroactive disability benefits from August 2001—the date she stopped working at National City. We note, however, that the Plan's definition of "disabled" is different from—and arguably more stringent than—the SSA's definition. *See* 42 U.S.C. § 423(d)(1)(A) (defining disability as the "inability to engage in any substantial gainful activity by

reason of any . . . physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months"). *But see Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 644 (7th Cir. 2007) (suggesting that the differences between the Plan's definition and the SSA definition are minor). In addition, we have repeatedly emphasized that the SSA's determination of disability is not binding on employers under ERISA. *See Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610 (7th Cir. 2007). SSA determinations are often instructive, but they are not determinative. *Id.* Because we are remanding, the Plan will have an opportunity to consider the SSA's determination when it reevaluates Love's eligibility.

### C. Remedy

We conclude that the Plan acted arbitrarily in terminating Love's disability benefits without giving a sufficient explanation of its reasons. Love wants us to award her retroactive benefits, but we decline to do so. Retroactive reinstatement of benefits is a proper remedy in cases where the evidence is "so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996). Here, the evidence is not so clear. "[W]hen a court or agency fails to make adequate findings or fails to provide an adequate reasoning, the proper remedy in an ERISA case . . . is to remand for further findings or explanations . . . ." *Quinn v. Blue Cross & Blue Shield Assoc.*, 161 F.3d 472, 477 (7th Cir. 1998). On

remand, the Plan should conduct a more thorough inquiry into whether Love meets the Plan's definition of "disabled." If it concludes that she does not meet that definition, it must adequately explain the reasons supporting its decision, including at a minimum an explanation of why it is discounting the medical opinions of Love's treating physicians.

Accordingly, we REVERSE the district court's entry of summary judgment and REMAND with instructions to remand to the Plan administrator for further proceedings consistent with this opinion.