Gregory **DEMAREE**, Plaintiff,

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants.**

**Cause No. 1:09–cv–1564–WIL–TAB.**

United States District Court, S.D. Indiana, Indianapolis Division.

June 1, 2011.

Amanda Lynn Yonally, Bridget L. O'Ryan, O'Ryan Law Firm, Indianapolis, IN, for Plaintiff.

Daniel Keenan Ryan, Hinshaw & Culbertson, Chicago, IL, Jennifer Jay Kalas, Renee J. Mortimer, Hinshaw & Culbertson, Schererville, IN, for Defendants.

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

WILLIAM T. LAWRENCE, District Judge.

Before the Court are two motions for summary judgment—one filed by the Plaintiff (Dkt. No. 45) and one filed by the Defendants (Dkt. No. 47). Both motions are fully briefed, and the Court, being duly advised, now **GRANTS** the Plaintiff's motion and **DENIES** the Defendants' motion for the reasons set forth below.

### FACTS

The relevant facts of record are as follow.

#### Demaree's Employment and Medical History

Plaintiff Gregory Demaree was employed at Ohio Valley Electric Corporation/ Indiana–Kentucky Electrical Corporation (hereinafter referred to as "Ohio Valley") from March 23, 1979, until December 6, 2006. Demaree performed the skilled job of maintenance mechanic; his position was classified as "heavy" work by the Department of Labor.

Demaree injured his left knee in 1995 and underwent two arthroscopic surgeries on the knee. In December 1997 he underwent a third surgery on the same knee. That surgery was performed by Dr. Joseph Randolph, an orthopaedic surgeon with OrthoIndy.

In April 2004 Demaree underwent an MRI because he was suffering from back,

hip and leg pain. The MRI revealed degenerative disc disease at L4–5 with disc bulge and compression of the right L5 nerve root, as well as bilateral foraminal stenosis and diffuse disc bulges at L2–3 and L3–4. The following month, neurosurgeon John Guarnaschelli performed surgery on Demaree's lumbar spine for a right L4–5 disk herniation with superimposed spinal stenosis. Dr. Guarnaschelli advised Demaree that the surgery would likely help relieve the radicular pain he had been experiencing in his hip and leg but was not likely to relieve his chronic back pain.

In March 2006, Demaree returned to Dr. Randolph at OrthoIndy because he was suffering from right shoulder pain. An MRI revealed chronic tendinosis, moderately severe degenerative changes in the AC joint, and periarticular edema. After trying more conservative treatment, Demaree underwent surgery in December 2006; during the surgery, a tear in his right rotator cuff was located and repaired. When Demaree continued to complain of significant right shoulder pain in the months following his surgery, Dr. Randolph referred him to Dr. Kevin Sigua, a physiatrist with OrthoIndy, for pain management. Demaree was prescribed a variety of medication to address his continued pain.

Between February 2007 and July 2007, Demaree underwent over fifty physical therapy sessions. In July 2007 his physical therapist reported that he continued to have limited range of motion in his shoulder and increased pain and swelling with exercise. At his therapist's recommendation, Demaree discontinued physical therapy at that time.

In July 2007 Demaree reported to Dr. Randolph that he continued to have right shoulder pain and also had begun experiencing left shoulder pain as well. He was also experiencing increasingly severe neck pain. He returned to his neurosurgeon, Dr. Guarnaschelli, who ordered an MRI of his cervical spine that revealed mild multi-level degenerative disc disease as well as the following:

- "[v]ery large broad-based disc-osteophyte complex resulting in moderate to severe bilateral neural foraminal narrowing and moderate cord flattening" at C3–4;

- "broad-based disc-osteophyte complex and bilateral facet hypertrophy resulting in moderate bilateral neural foraminal narrowing and mild cord flattening" at C4–5;

- "predominantly left paracentral disc-osteophyte complex and uncovertebral spurring resulting in moderate to severe left neural foraminal narrowing and mild cord flattening" at C5–6;

- "broad-based disc-osteophyte complex resulting in mild bilateral neural foraminal narrowing but no significant cord flattening" at C6–7.

Record at 1224.

In August 2007 Demaree again saw Dr. Randolph, who noted that he was "not much better with his right shoulder," that he was "very difficult to examine because of tenderness," and that he was "developing a frozen shoulder on the right side." *Id.* at 1238. Dr. Randolph thought Demaree should return to physical therapy, and also sent him to Dr. Sigua to evaluate his medications, which Demaree reported were causing him a great deal of drowsiness. Dr. Sigua reported that he doubted Demaree's drowsiness was being caused by the medications, but he made some adjustments nonetheless. In response to Dr. Randolph's suggestion, Dr. Sigua had his athletic trainer instruct Demaree regarding exercises he could do that might aid his frozen shoulder.

On October 1, 2007, Dr. Randolph saw Demaree and noted the following:

Greg is still having pain in his right shoulder. He is not going to physical therapy. He is doing a home exercise program three days a week. He has discomfort with his exercise and he also has some heat that he complains of in the anterior aspect of his shoulder after his exercise.

On physical exam today, he does appear to have virtually full, if not completely full, active range of motion of the shoulder. [The] shoulder in external rotation is about 3/5 in terms of weakness. In forward flexion it does appear to be about 4/5. He has a multitude of symptoms. He complains that after sitting for 15–20 minutes he has pain in both shoulders that radiates into his upper back and neck that gives him a headache and also in his anterior chest. He has similar symptoms with prolonged standing. He is not working currently.

*Id.* at 1234.

Demaree also saw Dr. Sigua in October 2007 "for follow up of his chronic neck and shoulder pain." He continued Demaree's prescriptions for Darvocet, Cymbalta and Lyrica and noted that they were providing some, but not full, relief for Demaree's neuropathic symptoms. He recommended that he return to his neurosurgeon, which he did two weeks later. Dr. Guarnaschelli noted the following:

I have been specifically asked to re-evaluate him with regards [sic.] to the radiographic evidence of his cervical spondylosis. Indeed there is evidence of multi-level cervical spondylosis and indeed on neurologic exam there are several changes that are present that would indicate not only an early radiculopathy but also that of an early myelopathy. These changes include a restricted range of motion of the cervical spine. Any degree of prolonged standing or any degree of prolonged sitting does exacerbate the neck pain as well as having some upper shoulder and arm pain and numbness. It is really not brought about by Valsalva maneuvers. Indeed he has unremarkable Lhermitte's sign. However, he does have increased hyperreflexia 3+/4+ of the biceps, triceps, and brachioradialis. He has a positive Hoffman's as well as increased reflexes in the lower extremities including both knee jerks and ankle jerks. He does not have any clonus or other pathologic reflexes noted. All of which are consistent with his early to moderate cervical spondylosis and degenerative changes.

*Id.* at 1219. Dr. Guarnaschelli "strongly urged" Demaree not to consider surgery at that time, but noted that it might become necessary in the future. He further told Demaree that he "want[ed] him to be active" but that he should "avoid any extremes where a blow to the head or neck could jeopardize his overall neurologic function." *Id.*

Because he had reported numbness and tingling in his left arm, Dr. Sigua suggested that Demaree undergo an EMG, and although Demaree reported that his symptoms had improved since he bought a new Lazy–Boy chair, an EMG was performed on July 24, 2008. The results were normal. Dr. Sigua noted that "[c]linically, I could not find a clear etiology for Demaree's symptoms. His symptoms do suggest a cervical radiculopathy; however, I cannot document this and there is no axone loss. Continued clinical correlation of the patient's symptoms are [sic.] recommended." *Id.* at 1138.

### Demaree's Claim for Disability Benefits

Demaree participated in the group long-term disability income insurance program (hereinafter "the Plan") offered by Ohio Valley to its employees. Defendant Life

Insurance Company of North America ("LINA") issued the group long term disability policy and is a fiduciary of the Plan.

Following both his 1998 knee surgery and his 2004 lumbar surgery, Demaree received disability benefits under the Plan for a period of time and then returned to his job as a maintenance mechanic after his recovery was complete. He again applied for long-term disability benefits following his rotator cuff surgery in December 2006. His application was approved by LINA on February 28, 2007, with an effective date of February 4, 2007.

Pursuant to the Plan, for the first 24 months Demaree was considered disabled by the Plan because he was unable to perform all the essential duties of his regular occupation; that is, he was unable to perform the heavy work required by his maintenance mechanic job. After benefits were paid for 24 months, however, the definition of disabled under the Plan changed, and the relevant question became whether Demaree was "unable to perform all the essential duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience."

In August 2007, LINA had surveillance performed to record Demaree's activities because they apparently believed he was working while receiving disability benefits. *Id.* at 1269.[1] The surveillance report was summarized by a fraud specialist as follows:

> On the first day of surveillance, [Demaree] drove to an auto shop and then went to a wholesale business. [Demaree] then drove to [a business] and then went to [another business] where it is believed [his] girlfriend works. Later [Demaree] shopped at Wal–Mart, returned to [his girlfriend's workplace], and then returned home.
>
> On the second day, [Demaree] checked his mail, kissed an unidentified woman goodbye as she left his residence, and then walked into his residence out of view.
>
> Specifically, we have obtained seven minutes of film of the claimant walking, entering and exiting his vehicle, pushing a shopping cart, loading a tower fan into his truck [using his left arm], checking his mail, and kissing an unidentified woman.

*Id.* at 1268–69.

As the 24–month mark approached, LINA set out to obtain statements from Demaree's treating physicians regarding his ability to work. On December 6, 2008, Dr. Sigua completed an Attending Physician Statement of Disability in which he opined that Demaree was totally disabled for any occupation and would remain so permanently due to chronic upper and lower back pain and neck symptoms. Dr. Randolph completed the same form for LINA and also opined that Demaree was permanently unable to perform any work due to shoulder pain. Neither doctor listed anything in the area of the form that asked for "objective findings." Later that month, LINA sent Dr. Sigua a letter asking him if he was restricting Demaree "from performing sedentary to light work at this time." Dr. Sigua responded in the affirmative. In an accompanying form he stated that he had restricted Demaree from work and that "[h]e has a history on [sic.] cervical degeneration, back pain, and chronic shoulder pain so I doubt he would not [sic.] tolerate any type of work." *Id.* at 1114. This was consistent with Dr. Sigua's treatment notes in both December

---

1. Demaree correctly notes that LINA did not mention this surveillance report in either of its denial letters and there is no evidence that it relied upon it in arriving at its decision to terminate Demaree's benefits.

2007, in which he stated that "[s]ince he has chronic neck pain and shoulder pain, I do not feel that Mr. Demaree can do any type of gainful employment," *id.* at 1226, and December 2008, in which he noted that Demaree "continues to be on SSI disability, which I think is appropriate." *Id.* at 1130.

In February 2009, LINA referred Demaree to Dr. Stacie Grossfeld for an independent medical examination. Her conclusion was that she "anticipate[d] that this gentleman could return back to sedentary work." *Id.* at 1050. The notes from Dr. Grossfeld's examination are as follow:

> His physical exam reveals a 52 year old gentleman standing 6′3″ weighing 236 pounds. He has three well-healed incisions from his prior rotator cuff surgery on his right shoulder. He had atrophy involving his supraspinatus and infraspinatus fossa compared to the contralateral side. It was difficult to get any true range of motion results because of his grimacing, complaints of pain, and guarding throughout the exam. Just simply lightly touching his head, neck or shoulder region caused him what he would consider "excruciating pain." He would pull away from me when I was examining him, so it was very difficult to get an accurate exam. I was able to passively bring his right shoulder to 110, abduction is to 120, external rotation to 45 degrees, and internal rotation to 35 degrees. Again, there was guarding, grimacing, and him making complaints of pain throughout the exam. 2/2 radial pulse. Full range of motion of the elbow is noted. He has very limited range of motion of his cervical spine again from guarding.

*Id.* at 1048–49. Thus, it appears that Dr. Grossfeld focused her examination on De-

maree's rotator cuff injury. While her summary of Demaree's medical records includes mention of the July 2007 MRI of his cervical spine ordered by Dr. Guarnaschelli and the fact that he did not recommend surgery for his back or his neck, her only diagnosis was "probable recurrent rotator cuff tear or a rotator cuff that never completely healed." *Id.* at 1049. Dr. Grossfeld attached to her report a physical ability assessment form on which she opined that Demaree could continuously sit, stand, and occasionally walk, reach, lift 10 pounds, carry 10 pounds and push and pull 10 pounds. She gave no explanation for how she arrived at those conclusions.

On February 17, 2009, LINA faxed Dr. Grossfeld's report to Dr. Sigua and Dr. Randolph along with a form asking them to "indicate if you are in agreement with the findings" and stating that "if we do not receive your response by February 19, 2009, we will assume that you are in agreement with the enclosed IME." [2] Dr. Randolph apparently returned the form the same day, checking the "I disagree" box and noting that Dr. Grossfeld had incorrectly referred to Dr. Sigua as a psychiatrist rather than a physiatrist. Dr. Randolph did not otherwise comply with the form's direction to "provide clinical rationale and/or imaging results to support your position." Dr. Sigua's response is dated February 20th; he checked the "No Comment" box.

On February 19, 2009, LINA had a transferrable skills analysis ("TSA") performed based on Dr. Grossfeld's physical ability assessment form and independent medical examination. The TSA found six jobs that met Demaree's wage replacement requirements and which were sedentary in nature and within his restrictions:

---

**2.** It is not clear to the Court why LINA would give busy physicians only two days to respond to its request.

expediter, cashier I, service clerk, skip tracer, procurement clerk, and maintenance dispatcher. *Id.* at 1072.

By letter dated February 19, 2009, LINA informed Demaree that based upon Dr. Grossfeld's IME and the TSA it had determined that he was no longer disabled as defined by the Plan because he could perform sedentary work, including the positions listed in the TSA. The letter recognized that Demaree was "claiming Disability due to right rotator cuff tear status post surgical repair and cervical degenerative disc disease" and that he was being treated by Dr. Randolph and Dr. Sigua. The letter noted the December 2008 Medical Request Form on which Dr. Sigua indicated that it was unlikely that Demaree could tolerate any type of work. While the letter also refers to the July 24, 2008, EMG, which was normal, it does not mention the July 2007 MRI. Rather, it states that "based on the medical documentation contained in your file, we do not have any supportive medical evidence which would preclude you from performing the occupations [listed above]."

A few days later, LINA sent Demaree letter indicating that it had received and reviewed Dr. Sigua's and Dr. Randolph's responses regarding Dr. Grossfeld's report and that those responses did not change its decision. LINA's claim notes indicate that it did not consider Dr. Randolph's disagreement with Dr. Grossfeld because Dr. Randolph did not provide any additional medical reports to support his opinion.

In August 2009 Demaree, now represented by counsel, appealed LINA's decision by utilizing LINA's appeal process. In support of his appeal, Demaree provided LINA with updated medical records. These included the report from an MRI of his right shoulder dated March 12, 2009, that revealed an "interval complete rup-

ture of the infraspinatus tendon," marked atrophy and fibrosis of the infraspinatus tendon and an interval rupture of the mid and posterior thirds of the supraspinatus tendon,[3] *id.* at 912, and the report from a June 23, 2009, cervical spine MRI that revealed "multilevel degenerative disc space changes that in conjunction with what appears to be just simply a narrow AP diameter of the bony spinal canal result in spinal stenosis at several levels in the cervical spine … perhaps most pronounced at the 3–4 and 4–5 levels but also present at the 5–6 level as well." *Id.* at 930.

On March 12, 2009, Dr. Randolph wrote a "to whom it may concern" letter in which he stated that "Greg Demaree is a patient of mine who has been for some time in regard to both shoulders. From my standpoint, he is unable to do his regular job that he was doing previously that required significant overhead work and fairly heavy work." *Id.* at 923.

In conjunction with his appeal, Demaree also submitted a letter from Dr. Sigua dated March 23, 2009, which stated that "Greg Demaree is a patient of mine who has been for some time in regard to chronic upper back and low back pain and neck symptoms. Unfortunately, he is unable to do any type of sedentary job due to his conditions." *Id.* at 924. This letter is consistent with Dr. Sigua's April 9, 2009, office visit note:

> At this point in time, we have been contacted by his insurance company secondary to [see] if Mr. Demaree can do any type of meaningful work. Clinically, I do not think he can do any type of work at this point in time. He has a certain amount of chronic neck pain which he has also had surgery for as well as back pain. He has had multiple amounts of surgery for his knees bilater-

---

**3.** In other words, Demaree had another tear in his rotator cuff.

ally and has also had shoulder surgery. He cannot stand for any prolonged period of time or even sit for a prolonged period of time without any pain. He also is on prescription pain medications which includes narcotic medications to just give him some functional relief.

*Id.* at 909. It is also consistent with a Physician's Statement form completed by Dr. Sigua on June 23, 2009, in which he stated his opinion that Demaree was unable to perform the essential duties of any occupation for which he is or may reasonably become qualified as a result of chronic back and neck pain that limits his ability to be in one position. *Id.* at 918–19. Dr. Guarnaschelli, Demaree's treating neurosurgeon, completed a Physician's Statement form on July 14, 2009, in which he also opined that Demaree was totally disabled from performing any occupation due to cervical and lumbar spondylosis. *Id.* at 927–28. Demaree also provided LINA with current medical records and a Physician Statement form dated June 18, 2009 from his primary care physician, Dr. Colleen Walker, who also opined that Demaree was unable to work,[4] explaining "physically he is a mess and likely faces more ortho/nerve surgeries and he will be in chronic pain the rest of his life." *Id.* at 936–37.

In addition to the medical records and statements from his treating physicians, Demaree also provided LINA with a lengthy report from Dr. Daniel Brown regarding an independent medical examination he conducted in June 2009. Dr. Brown concluded:

It is my best medical opinion that Mr. Demaree is completely and permanently disabled. When considering the issue of ability to perform, I make this determination in the context of an eight hour work day and forty hour work week. It is my opinion Mr. Demaree is unable to perform all of the essential duties of any occupation for which he is or may reasonably become qualified based on his education, training, or experience. In my experience as an occupational medicine specialist, I have performed thousands of post-offer physicals. The post-offer physicals I have performed include a wide range of occupations from sedentary to heavy work. Mr. Demaree would not meet the requirement of being able to perform the essential functions of the job or any physical which I have performed. It is my opinion there is no medical or surgical procedure which would significantly improve Mr. Demaree's condition to allow him to perform sedentary work for an eight hour day.

*Id.* at 950. In addition, Dr. Brown also reviewed the report of Dr. Grossfeld. Dr. Brown disputed several conclusions reached by Dr. Grossfeld, noting that she failed to consider or address medical con-

---

4. The Defendants' characterization in their brief of Dr. Walker's responses on this form is somewhat misleading. The Defendants say that "Dr. Walker, Demaree's internist, opined that Demaree could not work in "his job" due to his shoulders, neck, low back, and emotional condition. (Record, p. 937)." Defendants' Brief at 9. It is true that Dr. Walker wrote the following on the form in response to the question "Why is the patient's condition disabling?": "He is physically incapable of doing his job. His shoulders are shot. He has neck and low back disease medically & emotionally disabled as well." However, the same form clearly explains the Plan's definition of disability and asks if Demaree is "currently disabled under this definition"; Dr. Walker responded affirmatively. The next question on the form is "Was Mr. Demaree disabled from performing any occupation as of February 4, 2009?" Again, Dr. Walker answered affirmatively. She also handwrote in another place on the form "He can't work in my opinion." It is therefore disingenuous to suggest that the opinion of Dr. Walker as expressed on the form was that Demaree was unable to perform his previous job but could perform other jobs.

ditions other than Demaree's rotator cuff disease and stating "[t]here is no explanation why his other conditions are not addressed in the independent medical exam as these are conditions with significant impairment as well as marked subjective symptoms." These conditions significantly impact his functional status and disability. *Id.* Dr. Brown also did "not find Dr. Grossfeld's report convincing in reaching a conclusion of symptom magnification," and stated that he believed that "pain behavior" would be a more appropriate term for what Dr. Grossfeld described.[5] However, Dr. Brown went on to state that there may have been "some element of symptom magnification" during his own examination of Demaree, although "[i]n general, his examination shows good consistency with his medical records and subjective complaints." *Id.* at 951. Dr. Brown calculated a permanent partial impairment rating for Demaree of 38% and stated:

> While there are clearly significant differences between impairment and disability, it is my experience in examinees such as Mr. Demaree who have performed primarily physical work there is a significant correlation between levels of impairment and disability. Mr. Demaree exhibits a high level of impairment. Such impairment is consistent with an inability to perform many of the essential functions required working for an 8 hour day as an expediter, cashier, service clerk, skip tracer, procurement clerk or dispatcher.

*Id.* at 902.

In reviewing Demaree's appeal, LINA hired Dr. James A.K. Lambur to review the file and give his opinion regarding

Demaree's ability to work. Dr. Lambur's report states that he reviewed the following documents:

1. Operative Report arthroscopy of the shoulder, [Dr. Randolph] 6/6/06

2. MRI of the cervical spine, Kentuckiana Diagnostics 7/27/07

3. MRI of the right shoulder, [Dr. Randolph] 3/12/09

4. Clinical records, [Dr. Randolph and Dr. Sigua] 12/11/06 thru 6/23/09

5. Rehab. Services Scott Memorial Hospital 12/12/06–12/12/07

6. Cardiovascular Specialist Chris Stavens, M.D. 3/20/07

7. Clinical Records, [Dr. Guarnaschelli] 7/27 and 10/17/07

8. Claimant Disability questionnaire, Gregory Demaree undated

9. IME report [Dr. Grossfeld] 2/2/09

10. IME [Dr. Brown] 6/26/09

11. Laboratory Studies Quest Diagnostics, Inc. 2/10/09, 5/19/09

12. EMG Ortho Indy electrodiagnostic laboratories 7/24/08

*Id.* at 884. Dr. Lambur also noted the following "restrictions and limitations" from Demaree's treating physicians:

• Dr. Colleen Walker, 6/18/09–Claimant permanently disabled from any occupation as of 2/4/09

• Chris Stevens, M.D., Cardiology, patient "is not able to complete daily activities"

• Dr. Emily Stapp, "Mr. Demaree is not and never has been placed on medical leave by this office."

---

**5.** Dr. Brown explains that "symptom magnification" is defined as "[c]onscious or unconscious exaggeration of symptom severity in an attempt to convince an observer that one is truly experiencing some level of pain. It differs from malingering as it is an effort to be believed not necessarily to achieve a positive outcome." On the other hand, pain behavior such as "[g]uarding, grimacing, and pulling away could be considered normal reactions to painful examination." Record at 951.

- Joseph C. Randolph, M.D. "Patient cannot work at this time" 12/9/07
- Dr. Kevin Sigua, "off work" 12/24/08.
- Dr. Kevin Sigua, "restricting patient from performing sedentary to light work at this time" 12/24/08
- Dr. John Guarnaschelli, "patient currently disabled from performing any occupation as of 2/4/09"
- Dr. Kevin Sigua, "patient currently disabled" 6/12/09
- Joseph Randolph, M.D., "He is unable to do his regular job that he was doing previously."

Dr. Lambur also stated that he spoke with Dr. Sigua by telephone on October 6, 2009, and reported the following:

After discussion of the patient's current status, Dr. Sigua concurred with this reviewer that most probably the patient would be able to engage in a sedentary occupation. His only concern was what opinion Dr. Randolph would have relative to an arthritic condition in the claimant's knee. I thanked him for his review and his input and appreciated his concurrence with my observations and in his opinion, the claimant is well able to engage in a sedentary occupation.

Record at 885–86. Subsequent to the preparation of his initial report, Dr. Lambur also spoke by telephone with Dr. Randolph. In an addendum to his report, Dr. Lambur stated the following:

Dr. Randolph after discussion of the claimant, Gregory Demaree's current status, concurs that, while he does have rotator cuff disease and that overhead work would be precluded, there is no contraindication to this gentleman engaging in full time, eight hour day, sedentary occupation with the proviso that there is no requirement for repetitive or extended activity of the upper extremities above shoulder level. While the individual does have some degenerative osteoarthritic changes as well, this

should not preclude him from entering the sedentary work force.

*Id.* at 882.

With regard to Dr. Guarnaschelli, Dr. Lambur noted:

Evaluation by [Dr. Guarnaschelli] in July 2007 and again in October 2007 revealed cervical spondylosis and identifies "restricted range of motion of the cervical spine." Dr. Guarnaschelli, however, does not define the limitations of motion to quantify significance of same. Dr. Guarnaschelli also identifies complaints of increased discomfort in the neck with prolonged standing or sitting, however, does not provide specific time frames. There is no indication of neurologic sequelae relative to his observations of orthopedic pathology in the cervical spine and this may be a normal variation for the claimant's age and prolonged heavy work occupation.

*Id.* With regard to Dr. Brown, Dr. Lambur opined:

The evaluation by Daniel Brown, who performed an Independent Medical Evaluation on 6/26/09, indicates Mr. Demaree exhibits a high level of impairment consistent with an inability to perform essential functions required in an eight hour day in a sedentary setting. He provides, however, no rationale in the opinion of this reviewer to support that claim. There is no indication of severe low back (lumbar) disc disease, nor is there any indication of severe cervical pathology lending itself to neurological sequelae. While it is true that the MRI studies would support some limitation in the range of motion of the left shoulder, there is no documentation that this gentleman cannot significantly contribute to a work force in the sedentary level. Range of motion measurements of the range of motion of the left shoulder show only mild diminution in pain of internal and external rotation

and only limited pain at the extremes of motion in abduction and flexion. It is also noted that impingement signs are "equivocal." Service clerks, cashiers, procurement clerk and dispatcher are some of the occupations identified by Dr. Brown, in which the claimant is unable to participate. His reasoning is not followed by cogent thought as to why there is an inability to perform those functions. All pathological states identified by Dr. Brown are in the opinion of this reviewer, based upon claimant's contribution to the discussion relative to his inability to function rather than a clinical exam and documentation of deficiency for same.

*Id.* at 887–88. Finally, with regard to Dr. Grossfeld, Dr. Lambur notes that she "indicated that claimant showed symptom magnification throughout the entire exam and in conclusion, identified that she would anticipate that this gentleman could return back to sedentary work. This review concurs with that observation." [6]

On October 12, 2009, LINA upheld its prior decision to deny Demaree's claim. The letter explaining the decision reads, in relevant part:

Mr. Demaree's complete file, including any additional information you submitted, was reviewed in its entirety without defense to prior review. Additional information we received consisted of the following:

—Medical information from Dr. Randolph, Dr. Sigua, Dr. Guarnaschelli, Dr. Walker, and Dr. Stavens

—A copy of the Independent Medical Evaluation report, performed on June 26, 2009 by Dr. Brown.

To ensure appropriate interpretation of the medical documentation, Mr. Demar-

ee's file was referred for an independent peer review. James A.K. Lambur, M.D., F.A.A., O.S., F.A.C. S., F.I.C.S. a Diplomat, American Board of Orthopaedic Surgery and National Board of Medical Examiners completed the medical review.

In order to clarify your functionality, Dr. Lambur contacted Dr. Randolph and Dr. Sigua. On October 6, 2009 Dr. Lambur spoke with Dr. Sigua. Dr. Sigua stated that, most probably, Mr. Demaree would be able to engage in a sedentary occupation. Dr. Sigua further stated that he was concerned what Dr. Randolph's opinion would have relative to Mr. Demaree's arthritic knee. On October 8, 2009, Dr. Lambur spoke with Dr. Randolph. Dr. Randolph agreed that Mr. Demaree is capable of entering into the sedentary work force.

After reviewing Mr. Demaree's medical records, and speaking with his physicians, Dr. Lambur noted that while Mr. Demaree is unable to return to work in his usual occupation, which requires heavy work and overhead work, there is no contraindication to his entering into a sedentary work level with the provision that there is no undo demand for work and/or function of the upper extremities above chest level. He noted functioning above chest level would be difficult and limited due to rotator cuff rupture.

Dr. Lambur noted that the evaluation by Daniel Brown, who performed the Independent Medical Evaluation on June 26, 2009, indicates that Mr. Demaree exhibits a high level of impairment consistent with an inability to perform essential functions required in an eight hour day in a sedentary setting; however, Daniel

---

**6.** Presumably Dr. Lambur means he concurs with Dr. Grossfeld's conclusion regarding Demaree's anticipated ability to perform sedentary work. Inasmuch as Dr. Lambur was not present for Dr. Grossfeld's examination of Demaree, he presumably does not mean that he agrees with her opinion that he exhibited symptom magnification during the exam.

Brown does not provide rationale to support that claim. There is no indication of severe low back (lumbar) disc disease, nor is there any indication of severe cervical pathology lending itself to neurological sequelae. Dr. Lambur further noted that while it is true that the MRI studies would support some limitation in the range of motion of the left shoulder, there is no documentation that this gentleman cannot significantly contribute to a work force in a sedentary level. Range of motion measurements of the range of motion of the left shoulder show only mild diminution in pain of internal and external rotation and only limited pain at the extremes of motion in abduction and flexion. The Independent Medical Examination performed by Dr. Stacey L. Grossfeld indicated that Mr. Demaree showed, symptom magnification throughout the entire exam and in conclusion, identified that she would anticipate that Mr. Demaree could return back to sedentary work.

After reviewing Mr. Demaree's file, we concluded that the information available does not support a functional loss to preclude Mr. Demaree from performing any occupation. Therefore, we must affirm the previous decision to deny Mr. Demaree's Long Term Disability claim.

*Id.* at 701.

### Demaree's Claim for Social Security Disability Benefits

Demaree was required by the terms of the Plan to apply for social security disability income benefits ("SSDI") from the Social Security Administration ("SSA"). If he had failed to do so, his monthly benefit would have been reduced by the amount he would have received had applied for and been awarded SSDI benefits.

In February 2007 LINA referred Demaree to Advantage 2000, a company it pays to assist its insureds in applying for SSDI benefits. With Advantage 2000's help, Demaree applied for SSDI benefits; his application was approved in January 2008. Pursuant to the terms of the Plan, Demaree's monthly benefit from LINA was reduced by the amount he received in SSDI benefits and LINA was entitled to reimbursement of the amount it had "overpaid" while waiting for the SSDI determination. Accordingly, once Demaree's SSDI benefits were approved, Advantage 2000 coordinated the required reimbursement of LINA by Demaree in the amount of $13,867.20.

### STANDARD OF REVIEW

Demaree filed this action pursuant to the applicable provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, seeking the Court's review of LINA's decision to terminate his long-term disability benefits. The parties agree that it is appropriate for this Court to review LINA's decision under the arbitrary and capricious, or abuse of discretion, standard[7] because the Plan has delegated discretionary authority to LINA to determine eligibility for benefits.

The arbitrary and capricious standard of review is deferential, of course, but it "is not a euphemism for a rubber-stamp." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir.2009). The Seventh Circuit has explained that "arbitrary-and-capricious review turns on whether the plan administrator communicated 'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an ab-

---

**7.** "For ERISA purposes the arbitrary-and-capricious standard is synonymous with abuse of discretion." *Holmstrom v. Metropolitan*

*Life Ins. Co.*, 615 F.3d 758, 767 n. 7 (7th Cir.2010) (citations and quotation marks omitted).

sence of reasoning to support the plan administrator's determination.'" *Id.* at 484 (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan,* 557 F.3d 823, 832–33 (7th Cir.2009)). In *Majeski,* the court explained that "a plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue." *Id.*

### DISCUSSION

Pursuant to ERISA, LINA was required to afford Demaree "an opportunity for full and fair review" of his claim and to communicate specific reasons for the denial of his claim. *Holmstrom v. Metropolitan Life Ins. Co.,* 615 F.3d 758, 766 (7th Cir. 2010). Demaree argues that LINA failed to satisfy these requirements in several respects. The Court agrees.

### Failure to Consider Social Security Determination

■ As noted above, Demaree, with the assistance of a company hired by LINA, applied for and was awarded SSDI by the SSA; indeed, he was required to apply for SSDI by the terms of the Plan. Demaree correctly points to several cases, including *Ladd v. ITT Corp. and MetLife Ins. Co.,* 148 F.3d 753 (7th Cir.1998), and *Holmstrom,* 615 F.3d 758, that stand for the proposition that an ERISA plan administrator's "failure to consider the [SSA's disability] determination in making its own benefit decisions suggests arbitrary deci-

sionmaking." *Holmstrom,* 615 F.3d at 773. This is because the SSA's definition of disability is very stringent; generally, in order to qualify for SSDI an applicant must demonstrate that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Logically, then, it seems likely that a person who satisfies that definition would also satisfies an ERISA Plan's definition of disability. But likely does not mean necessarily, which is why a plan administrator should consider the SSA's disability finding, but is not automatically bound by it,[8] as there could be valid reasons that it would reach a conclusion different from that reached by the SSA. *See Krolnik v. Prudential Ins. Co.,* 570 F.3d 841, 844 (7th Cir.2009); *Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 333 (7th Cir.2000).

In this case, there is no evidence that LINA considered the SSA's disability determination in arriving at its decision. LINA argues that the ALJ's findings are entirely consistent with its own and therefore the SSA determination actually supports LINA's finding that Demaree is not disabled under the Plan definition. Specifically, LINA argues that both it and the SSA found that Demaree was capable of performing sedentary work, and that LINA correctly determined that he therefore was not disabled under the Plan, which required him to be "unable to per-

---

8. LINA argues, correctly, that it is not estopped from reaching a conclusion different from the SSA simply because it advocated (or paid someone to advocate) on Demaree's behalf before the SSA. LINA also correctly points out that the SSA's determination that Demaree was disabled was based on the application of regulations, commonly referred to as "the Grid," that dictate a finding of disabled when certain conditions are met—in this case, that the claimant is over 50 years old, can perform no more than sedentary work, and has no identified job skills or education that could be used for that type of work. In theory, a person could be disabled pursuant to the Grid even if there were jobs that he could perform, and in such situations a plan administrator would have a valid reason for reaching a different conclusion than the SSA.

form all the essential duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience." This argument is based on an erroneous reading of the SSA's decision, however. The SSA did not find that Demaree was capable of performing the full range of sedentary work; rather, he found that he was able to perform "a range of sedentary work that requires him to lift no more than 10 pounds occasionally, requires him to stand and/or walk no more than 2 hours total in an 8 hour workday, and allows him to alternate between sitting and standing at will." Record at 1212. That is a significantly limited range of sedentary work; in other words, the SSA found Demaree's abilities to be more limited than LINA did. Therefore, LINA should have considered the SSA's findings and explained why it rejected the SSA's determination regarding Demaree's abilities.[9]

### Consideration of Medical Evidence

■ Demaree's overarching argument is that LINA arbitrarily discounted or ignored evidence of record that supported his claim of disability, including the repeatedly expressed opinions of his treating physicians. LINA, in turn, argues that "the Court is not confronted with competing medical opinions from Demaree's treating physicians and LINA's consulting physicians. Both Drs. Sigua and Randolph, Demaree's primary treating physicians, told Dr. Lambur that Demaree could perform sedentary work." LINA Brief at 19.

This argument ignores the totality of the record. As set forth at length in the recitation of facts above, Dr. Sigua repeatedly expressed, in writing, his unequivocal opinion that Demaree was unable to perform sedentary work.[10] Dr. Guarnaschelli, Demaree's treating neurosurgeon, and Dr. Walker, his internist, expressed the same unequivocal opinion. Only Dr. Randolph's written opinions are equivocal; while in December 2008 he opined that Demaree was "permanently unable to perform any work due to shoulder pain," in March 2009 he wrote that "[f]rom my standpoint, he is unable to do his regular job that he was doing previously that required significant overhead work and fairly heavy work." Therefore, the written opinions of Dr. Sigua, Dr. Guarnaschelli, and Dr. Walker all support Demaree's disability claim, while the written opinions of Dr. Randolph do not provide support for either side.[11]

---

9. It is, of course, possible that the jobs listed in the TSA are consistent with the abilities found by the SSA. There is nothing in the record to so indicate, however, inasmuch as the TSA specifically states that Demaree "is able to perform at the sedentary level of physical demand *with continuous sitting and standing* and occasional walking." Record at 1072 (emphasis added).

10. LINA attempts to characterize Dr. Sigua's opinion as uncertain because at one point he stated that he "doubted" if Demaree could tolerate any type of work. Given that Dr. Sigua unequivocally stated his opinion several other times, it is unreasonable to read anything significant into his choice of words on that single occasion. Indeed, one could point to Dr. Grossfeld's conclusion—"*I would anticipate that* this gentleman could return back to

sedentary work"—as similarly lacking in certainty, and yet LINA was confident enough in it to base its original denial decision on it.

11. Dr. Randolph is the surgeon who performed Demaree's rotator cuff surgery and performed follow-up care after the surgery. His opinion that "from his perspective" Demaree could not perform his past, heavy work simply means that Demaree's shoulder condition prohibited heavy work. That opinion is not inconsistent with the opinions of Demaree's other physicians—whose treatment of him included more than just his shoulder condition—that Demaree's overall condition prevented him from performing any job. Dr. Randolph's opinion thus does not provide support for LINA's determination that Demaree could perform sedentary work in spite of all of his physical problems.

LINA notes that "[w]hile Drs. Sigua and Randolph stated equivocally on paper that Demaree was disabled, when pressed in a telephone conference with Dr. Lambur, they both conceded that Demaree could perform in a sedentary capacity." LINA Response at 19. Thus, it appears that LINA disregarded the various physicians' written opinions and focused instead on Dr. Lambur's representation of his telephone conversations with Dr. Sigua and Dr. Randolph in which he apparently "pressed" them to agree with his position that Demaree was capable of sedentary work. The Court is troubled by this approach. It would be one thing for a consulting physician to call a treating physician and ask him to elaborate on the basis of his previously expressed opinion; it is quite another for the consulting physician to express his own contrary opinion and attempt to convince the treating physician to agree with him, which appears to be what occurred in this case between Dr. Lambur and Dr. Sigua. Further, Dr. Lambur did not provide a transcript of their conversation, but rather his own brief summary of it; indeed, Dr. Lambur's own description of what Dr. Sigua ultimately said morphs from "[a]fter discussion of the patient's current status, Dr. Sigua concurred with this reviewer that *most probably* the patient would be able to engage in a sedentary occupation" to the much more confident "in his opinion, the claimant is well able to engage in a sedentary occupation." Record at 886 (emphasis added). It was unreasonable for LINA to take the position that these statements in Dr. Lambur's report about his conversation with Dr. Sigua are more reliable than Dr. Sigua's repeated and unambiguous written statements. Further, LINA's position entirely ignores the written opinions of Dr. Guarnaschelli and Dr. Walker.

Contrary to LINA's position before this Court, this is a situation in which treating physicians and consulting physicians disagree. However, there is no "treating physician rule" that applies to ERISA cases, *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), and therefore LINA was not required to give the opinions of Demaree's treating physicians any special deference. That said, LINA's decision to reject those opinions must have some rational basis. *Id.* (Plan administrators cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians."); *Love v. National City Corp. Welfare Benefits Plan,* 574 F.3d 392, 397 (7th Cir.2009) ("The Plan must provide a reasonable explanation for its determination and must address any reliable, contrary evidence presented by the claimant.").

In this case, LINA argues that it was entitled to rely on the opinions of Dr. Grossfeld and Dr. Lambur who, they argue, "provided reasoned and rational explanations as to their interpretation of the medical records, and as to why they disagreed with the opinions of Demaree's treating physicians and medical experts." LINA Brief at 19. The Court disagrees.

With regard to Dr. Grossfeld, as noted above it appears that she was focused almost exclusively on Demaree's right shoulder. While she acknowledges in her recitation of his medical history that he had been treated for chronic upper back, lower back, and neck pain and that his July 2007 MRI showed multilevel disk degeneration, the only diagnosis she lists is "probable recurrent rotator cuff tear or a rotator cuff that never completely healed." Record at 1049. Accordingly, Dr. Grossfeld's opinion ignores the effects of the back and neck pain suffered by Demaree on his ability to work and does not support a determination that he can perform sedentary work in spite of that pain.

That leaves Dr. Lambur's report as the only support for LINA's determination. However, other than Dr. Grossfeld's problematic report, Dr. Lambur does not point to anything in the record that supports his opinion that Demaree can perform sedentary work and does not explain how he arrived at that opinion.[12] Instead, Dr. Lambur spends the bulk of his report pointing out things that he believes are absent from the record, without explaining why those absences are significant. Indeed, there are numerous problems with Dr. Lambur's report that render LINA's reliance on it unreasonable.

First, with regard to Dr. Guarnaschelli, Dr. Lambur states the following:

> MRI of the cervical spine performed 7/27/07[13] revealed broad based-osteophyte complex with some neuroforaminal narrowing at C3–4, C4–5 and C5–6. Dr. Guarnaschelli's repeat evaluation on 10/17/07 while identifying the possibility of early myelopathy emanating from the cervical area does not identify any notable functional neurologic impairment. Conservative management was recommended and the claimant was "strongly urged" not to consider surgical intervention. Once again, there is no identification of nerve root impingement or neuro sequelae from apparent generalized spondylosis in the mid cervical spine.

*Id.* at 886. However, Dr. Guarnaschelli specifically noted that "on neurologic exam there are several changes that are present that would indicate not only an early radiculopathy but also that of an early myelo-

pathy" including "a restricted range of motion of the cervical spine," "increased hyperreflexia 3+/4+ of the biceps, triceps, and brachioradialis, ... a positive Hoffman's as well as increased reflexes in the lower extremities including both knee jerks and ankle jerks."[14] *Id.* at 1219. Dr. Guarnaschelli concluded that these neurological signs were all consistent with the early to moderate cervical spondylosis and degenerative changes shown on Demaree's MRI. Dr. Lambur fails to acknowledge these findings by Dr. Guarnaschelli and fails to explain why he believes that these findings are not sufficient to support Dr. Guarnaschelli's conclusion that Demaree experiences disabling pain from his objectively verified (by MRI) spinal condition.

Dr. Lambur also complains that Dr. Guarnaschelli did not quantify his statements that Demaree had limited range of motion and experienced increased pain and numbness from prolonged sitting or standing. Again, however, Dr. Lambur does not explain how this lack of quantification renders Dr. Guarnaschelli's conclusions regarding Demaree's abilities suspect. Similarly, Dr. Lambur complains that Dr. Sigua did not measure Demaree's range of motion, but does not explain how that measurement would have been relevant to Dr. Sigua's treatment of Demaree's pain and how his failure to perform it makes his opinion unreliable. Dr. Lambur also notes that "[it] appear[s] that care was provided [by Dr. Sigua] based upon claimant's ongoing complaints of discomfort." *Id.* at 887.

---

**12.** Inasmuch as Dr. Lambur had already concluded that Demaree could perform sedentary work prior to his telephone conversations with Dr. Randolph and Dr. Sigua, he obviously did not consider those conversations in arriving at his opinion.

**13.** The Court notes that it does not appear that Dr. Lambur was given the report from Demaree's June 23, 2009, cervical spine MRI.

**14.** In the context of discussing Dr. Sigua's records, Dr. Lambur states that "there were no aberrations of reflexes," yet he failed to acknowledge that Dr. Guarnaschelli did, in fact, note abnormal reflexes.

If Dr. Lambur believes this was improper, he does not explain why. He does not point to anything in Dr. Sigua's records that suggest that Dr. Sigua suspected—or should have suspected—Demaree of malingering. Given the fact that Demaree has objectively verified conditions that typically cause pain—including a torn rotator cuff, degenerated discs in his spine, and spondylosis—and given the subjective nature of pain and the fact that different individuals experience different levels of pain even if they have the same underlying condition, it is unclear what Dr. Lambur thinks Dr. Sigua could have done to corroborate Demaree's reports regarding the extent of pain he was experiencing.

Dr. Lambur spends the bulk of the "medical analysis" section of his report addressing Dr. Brown's report of his independent medical evaluation. Dr. Brown's report contains comprehensive range of motion measurements, the very thing Dr. Lambur complains is missing from the records of Drs. Sigua and Guarnaschelli. Surprisingly, however, Dr. Lambur's only mention of them is the following sentence: "Range of motion measurements of the range of motion of the left shoulder show only mild diminution in pain [15] of internal and external rotation and only limited pain at the extremes of motion in abduction and flexion." *Id.* It is not at all clear why Dr. Lambur mentions only Demaree's *left* shoulder range of motion (inasmuch as it is his right shoulder that has the torn rotator cuff) and wholly ignores the numerous other range of motion measurements taken by Dr. Brown, including those of his right shoulder, cervical spine, and lumbar spine, among others. Dr. Lambur also notes that "[t]here is no indication of severe low

back (lumbar) disc disease, nor is there any indication of severe cervical pathology lending itself to neurological sequelae." *Id.* Ironically, however, while Dr. Lambur opines that Dr. Brown provides no rationale to support his conclusion that Demaree cannot perform sedentary work and states that "[h]is reasoning is not followed by cogent thought as to why there is an inability to perform those functions," Dr. Lambur wholly fails to acknowledge the objective evidence of Demaree's back, neck and shoulder problems and explain why those problems do not explain the disabling pain alleged by Demaree.

Finally, in the conclusion section of his report, Dr. Lambur purports to answer the following question: "If you find that the [treating physicians' work] restrictions are not supported; based on the available medical what restrictions are supported?" Dr. Lambur's answer is as follows:

> In light of the claimant's rotator cuff repair on the left, overhead work would be precluded. Indeed, most functioning above chest level would be difficult would be limited by decrease in function due to rotator cuff rupture. Record review fails on all counts to identify any valid measurements of range of motion of the left glenohumeral joint, however, did under most circumstances, the above is true (e.g. limited shoulder motion above chest level).

*Id.* at 888. This response is troublesome for several reasons. First, it is nonsensical. Second, the parts of it that are discernable are inaccurate. It was Demaree's right rotator cuff that was torn, repaired, and then re-torn, not his left. Further, Dr. Brown's report contains

---

**15.** It appears that the words "in pain" were inadvertently inserted in this sentence. Typographical errors happen, and the Court does not mean to suggest that the presence of typographical errors means the absence of

reasoned thought. However, it is quite troubling that this sentence—error and all—was copied verbatim by LINA in its letter denying Demaree's appeal and used as rationale for its decision.

range of motion measurements for the left glenohumeral (shoulder) joint—in fact, Dr. Lambur discussed them earlier in his report, without questioning their validity. Compounding the problems with this paragraph is Dr. Lambur's statement in the previous paragraph that "[t]here is no support of documentation to identify functional impairment due to failed rotator cuff repair." This suggests that perhaps Dr. Lambur, like Dr. Grossfeld, was only looking at whether Demaree's shoulder injury precluded sedentary work, rather than considering his cervical and lumbar pain as well. In addition, this statement is false; even Dr. Lambur and Dr. Grossfeld agree that Demaree's failed rotator cuff repair causes "functional impairment" (i.e. impaired "functioning above chest level").

Dr. Lambur's report is error-ridden, internally inconsistent, and lacking in any real analysis. It simply does not supply a rational basis for LINA's decision to deny Demaree's claim in spite of his treating physicians' opinions, as well as that of Dr. Brown, that he is unable to perform sedentary work. Inasmuch as the only rationale given by LINA for its decision was Dr. Lambur's report, LINA's decision was arbitrary and capricious.[16]

### APPROPRIATE REMEDY

■■■ Demaree asks this Court to award her benefits directly rather than remanding for further proceedings. "When a plan administrator fails to provide adequate reasoning for its determination, our typical remedy is to remand to the plan administrator for further findings or explanations." *Majeski*, 590 F.3d at 484. A direct award of benefits is appropriate only in "the rare case where the

record before us contains such powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled." *Id.* While Demaree has demonstrated that LINA acted arbitrarily and capriciously, and indeed the justification it gave for denying Demaree's claim was woefully inadequate, the Court believes that LINA's deficiencies in this case are highly analogous to the plan's deficiencies in *Love,* 574 F.3d 392, a case in which the Seventh Circuit found remand, not a direct award of benefits, to be the appropriate remedy. Accordingly, this case is remanded with the same instructions that were given in *Love:*

> On remand, [LINA] should conduct a more thorough inquiry into whether [Demaree] meets the Plan's definition of "disabled." If it concludes that [he] does not meet that definition, it must adequately explain the reasons supporting its decision, including at a minimum an explanation of why it is discounting the medical opinion's of [Demaree's] treating physicians.

*Id.* at 398. In addition, LINA should ensure that it considers Demaree's physical condition as a whole, including his subjective symptoms, rather than focusing only on the limitations caused by his right shoulder injury.

### CONCLUSION

For the reasons set forth at length above, the Plaintiff's motion for summary judgment (dkt. no. 45) is **GRANTED** and the Defendants' motion for summary judgment (dkt. no. 47) is **DENIED.** This case

---

16. In light of this finding, the Court need not consider Demaree's arguments regarding LINA's structural conflict of interest. *See Raybourne v. Cigna Life Ins. Co.,* 576 F.3d 444 (7th Cir.2009) (conflict of interest "will tip the balance" in favor of the claimant in borderline cases).

is remanded for further proceedings consistent with this Entry.

SO ORDERED.