In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-1514

CRAIG CANTER,

*Plaintiff-Appellant,*

*v.*

AT&T UMBRELLA BENEFIT PLAN NO. 3
and AT&T SERVICES, INC.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18 C 7375 — **Jorge L. Alonso**, *Judge.*

———————————

ARGUED OCTOBER 27, 2021— DECIDED MAY 11, 2022

———————————

Before MANION, WOOD, and BRENNAN, *Circuit Judges.*

WOOD, *Circuit Judge.* Craig Canter worked as a premises technician for Illinois Bell Telephone Company, a subsidiary of AT&T Services, Inc. (AT&T). His job duties included installing wires, lifting heavy loads, and climbing tall ladders— sometimes as high as 28 feet tall and up to seven times per

day. But after he began to suffer from severe migraines, light-headedness, and dizziness, Canter concluded that he no longer could perform that work. He applied for short-term disability benefits in February 2017 through a plan that AT&T maintained for this purpose. The plan administrator granted benefits for a few months, but AT&T terminated them after an independent medical reviewer concluded that Canter's medical tests were normal and that his symptoms had improved. After Canter unsuccessfully appealed this decision using AT&T's internal processes, he sued AT&T and the plan. The district court granted summary judgment in favor of the defendants. We now affirm that judgment, but we reverse the court's award of $181 in *pro hac vice* fees to the defendants, as we find that *pro hac vice* fees are not taxable "costs" under 28 U.S.C. § 1920.

## I

### A

Canter began experiencing migraines and dizziness early in 2017, and on February 13 of that year he applied for short-term disability benefits under the AT&T Umbrella Benefit Plan No. 3 (the Plan). The Plan provides up to 52 weeks of short-term benefits if Sedgwick Claims Management Services, Inc., the Plan's administrator, finds the claimant "disabled by reason of sickness, pregnancy, or an off-the-job illness or injury that prevents you from performing the duties of your job" "with or without a reasonable accommodation." The Plan further specifies that a claim for disability "must be supported by objective Medical Evidence," which "includes, but is not limited to, results from diagnostic tools and examinations performed in accordance with the generally accepted principles of the health care profession." The Plan identifies a

failure "to furnish objective Medical Evidence" as a reason to discontinue those benefits.

Canter supported his disability claim with medical notes from two physicians (one of whom was Dr. Moriah Bang) at Advocate Medical Group. Those doctors documented his complaints of headaches, dizziness, and lower-back pain. Canter also provided a hospital discharge summary describing a recent CT scan, which had come back normal. Sedgwick approved his claim on February 22 for the period of February 13 through March 14, concluding that Canter "is out of work due to light headedness and headaches" and that it "would not be safe [for him] to climb, lift or drive" as is required of premises technicians.

Meanwhile, Dr. Bang referred Canter to Northwest Neurology for additional neurological testing. A doctor at Northwest ordered a head MRI and MRV, which, when performed, returned normal results. Lisa Jackson, a Certified Nurse Practitioner at Northwest, saw Canter at a follow-up visit on March 8. She documented that the test results were "unremarkable" but recommended that Canter return for another appointment and continue to stay home from work. Sedgwick received CNP Jackson's notes from that appointment and decided to extend the benefits by four weeks.

Canter saw CNP Jackson another three times over the next few months. Each time, Sedgwick extended the benefits. It did so even though additional medical tests continued to yield normal results, and Canter began to report improvement in some of his symptoms. On April 10, CNP Jackson noted that Canter's headaches had "nearly resolved" after he began taking the beta-blocker propranolol, though Canter still complained of lightheadedness upon physical exertion. On May

8, she wrote that the headaches had "improved significantly" though the "lightheadedness is worse." And on June 5, Canter reported that his "lightheadedness, headaches, and motivation to get up and work" had improved after he began receiving acupuncture and taking an herbal supplement. Sedgwick requested an update from CNP Jackson on July 10, and she obliged by submitting the notes from Canter's July 3 appointment; those notes reported "significant improvement of his headaches" and that his "persistent dizziness has resolved." On the other hand, the notes indicated that Canter was continuing to experience dyspnea (breathing difficulties) and "dizziness with exertion," and suggested that the dizziness "could be due to a cardiopulmonary problem."

After receiving the July 3 update, Sedgwick decided to refer Canter's case to Dr. Katherine Duvall, an independent reviewer who is board certified in occupational medicine. Dr. Duvall concluded that Canter was not disabled, given the absence of any abnormalities in his test results or other objective findings indicating impairment, and the fact that his self-reported symptoms had been improving. Her report states that she attempted to reach CNP Jackson by phone to speak about Canter's condition, but when she was unsuccessful, she submitted the report to Sedgwick later that same day. Based on Dr. Duvall's report and the medical record as a whole, Sedgwick notified Canter on August 7 that his short-term disability benefits were denied effective July 7, 2017. Citing CNP Jackson's July 3 notes and Dr. Duvall's review, the denial letter explained that Canter had not provided "objective Medical Evidence" to support his claim.

Canter did not take this letter as the final word. Hoping to contest it, he returned to Dr. Bang, who ordered fasting blood

tests, a stress echocardiogram, and a chest x-ray. But all of these returned normal results save for elevated levels in cholesterol and triglyceride (though neither party has suggested that these problems are related to his condition). Dr. Bang also referred Canter to a pulmonologist named Dr. Dennis Kellar, who ordered another stress echocardiogram, a pulmonary function test, and testing for sleep apnea. These results too were normal, save for a finding of "12% [bronchodilator] reversibility"—which Dr. Kellar's medical report indicated could be a sign of a "mild reactive airway" problem (such as a mild case of asthma).

With these additional tests in hand, Canter initiated the Plan's internal appeal process. Sedgwick informed Canter that it would submit the new results, along with the rest of the medical record, to two additional independent reviewers: Dr. Taj Jiva, who is board certified in pulmonary disease, and Dr. Mark Friedman, who is board certified in neurology. After reviewing the records and speaking by phone with Dr. Kellar, Dr. Jiva concluded that Canter was "fine" from a pulmonary perspective. For his part, Dr. Friedman tried calling CNP Jackson one time, and twice attempted to reach Dr. Bang, but they never connected. CNP Jackson returned Dr. Friedman's call on three occasions but could not reach him—a fact that AT&T and the Plan do not dispute but that the district court considered to be outside the administrative record and therefore of no relevance. Like Dr. Jiva, Dr. Friedman concluded that Canter provided "no evidence" in support of his disability claim. In a letter dated October 31, relying on the conclusions of Drs. Jiva and Friedman, Sedgwick denied Canter's appeal.

In January 2018, AT&T instructed Canter to report back to work, if he wanted to keep his job. He complied, but his

supervisor sent him home because he lacked a doctor's note releasing him for work. Canter then submitted a job-accommodation application to Sedgwick. A few weeks later, Sedgwick informed Canter that AT&T had retroactively granted him unpaid time off from July 7, 2017, through July 31, 2018. It later extended this accommodation through January 2019. But at the end of that period, AT&T informed Canter that it could not identify an open position that accommodated his work restrictions and so it removed him from the payroll. Worse yet for Canter, it notified him that because his short-term disability benefits had been terminated after only five months, he had failed to exhaust the 52-week period necessary under the company's plans to qualify for long-term disability benefits or a disability leave of absence.

B

After Sedgwick denied his internal appeal, Canter brought this case under the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, asserting a claim for wrongful termination of benefits against AT&T and the Plan. In addition to seeking reversal of the Plan's decision, Canter alleged that AT&T was equitably estopped under state law from pursuing repayment of a lump-sum payment that had (allegedly accidentally) been sent to Canter in February 2018. AT&T responded with a counterclaim for unjust enrichment.

The district court granted summary judgment in favor of the Plan and AT&T on the ERISA claim, finding that the termination decision was not arbitrary and capricious in light of the many normal test results. It further determined that Canter's evidence of the less-than-persistent efforts expended by the independent reviewers, and his evidence about his job accommodation, did not support a different result. The former,

the court thought, was not a proper part of the administrative record, and the latter was of minimal significance. The court declined to exercise supplemental jurisdiction over the state law claim and counterclaim and thus dismissed both without prejudice. AT&T and the Plan then filed a bill of costs, pursuant to which the district court awarded deposition fees and *pro hac vice* admission fees.

Canter now appeals the district court's disposition of his ERISA claim and the award of costs for the depositions and counsel's *pro hac vice* admission fee.

## II

### A

We evaluate *de novo* a district court's grant of summary judgment. *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 396 (7th Cir. 2009). When an ERISA benefit plan grants an administrator discretion to determine eligibility for benefits, as the AT&T Plan does for Sedgwick, we must consider whether that administrator's decision was arbitrary and capricious. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). Although this is a deferential standard, review under it is not a "rubber stamp"; we will find an administrator's determination to be arbitrary "when there is an absence of reasoning in the record." *Holstrom*, 615 F.3d at 766 (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774–75 (7th Cir. 2003)). Moreover, an administrator must explain its basis for discounting evidence presented by the claimant, even though an administrator is entitled to make a reasoned decision when there is evidence cutting in both directions. *Love*, 574 F.3d at 397; see also *Black*

*& Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). In making its decision, an administrator in Sedgwick's shoes must communicate its rationale to the claimant so as to provide "an opportunity for full and fair review" on appeal. *Id.*; see 29 U.S.C. § 1133.

Bearing in mind this deferential standard of review, we are satisfied that Sedgwick's determination was grounded in sufficient evidence and was adequately explained to Canter. Drs. Duvall, Friedman, and Jiva each rejected a finding of disability because Canter's many medical examinations between February and September 2017—which, to reiterate, included physical examinations, fasting labs, chest x-rays, CT and MRI scans, stress echocardiograms, and cardiopulmonary exercise testing—returned results that were largely normal. Their reports to Sedgwick thoroughly explained their conclusions. Although Canter points to contrary evidence in the record, it does not compel the opposite result, as we now briefly explain.

Canter first notes that pulmonary function testing performed on September 12 under the care of pulmonologist Dr. Kellar found a 12% bronchodilator reversibility, which Dr. Kellar believed could be a sign of a "mild reactive airway" problem such as a minor case of asthma. But Dr. Kellar discussed this result in a phone call with Dr. Jiva, who reported Dr. Kellar's own opinion that Canter was "fine" from a pulmonary standpoint. Dr. Jiva also concluded that Canter's pulmonary functioning was "essentially normal."

Next, Canter calls our attention to CNP Jackson's May 8 and July 3 notes stating that Canter displayed a "mild sway

on Romberg testing," referring to a simple balance test where the patient is observed standing erect with feet together and eyes closed. Though Sedgwick did not explicitly address the Romberg result in its written explanation, the problem for Canter is that no statement in the administrative record by CNP Jackson or any medical professional portrays this result as meaningful or otherwise ties it to a relevant functional limitation. This may be because a minor Romberg sway is common. See A. Khasnis & R.M. Gokula, *Romberg's Test*, 42 J. Postgrad. Med. 169, 171 (2003), https://pubmed.ncbi.nlm.nih.gov/12867698 ("Normal individuals also tend to sway to some extent on closing their eyes."). In any event, nothing in the record indicates that this result calls Sedgwick's determination into question.

Third, Canter argues that Sedgwick failed to address the fact that he continued to experience headaches and dizziness. We agree with his argument's premise that an administrator cannot disregard a claimant's self-reported symptoms just because a plan calls for "objective evidence." But our review of the record does not support a finding that Sedgwick committed this error.

Like many plans, AT&T's called for "objective Medical Evidence" consisting of "results from diagnostic tools and examinations performed in accordance with the generally accepted principles of the health care profession." We have approached comparable language flexibly, particularly for medical conditions such as fibromyalgia that do not manifest through physiological symptoms. See *Hawkins v. First Union Corp.*, 326 F.3d 914, 919 (7th Cir. 2009). We have underscored that a claimant's self-reported experience of pain, even without a clear physiological source, may indicate only that the search for such a

source is incomplete, and that such a report may not be dismissed out of hand. See *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 835 & n.8 (7th Cir. 2009) (finding that the administrator's failure to consider the potential, though unproven, connection between the claimant's pain and her diagnosis of osteoarthritis undercut the termination determination). The fact that pain or dizziness, or some other symptom, evades clinical detection or explanation is not by itself a reason to discount or disregard it. The central question remains whether an administrator has adequately addressed the adverse evidence in a manner that fits the medical situation at issue.

But just as self-reported evidence is not irrelevant, neither is it a trump card. The record as a whole is what matters. Here, extensive medical testing consistently yielded normal results, even though the medical providers and reviewers thought that a significant problem would have shown up in one or more concrete, physiological ways. Setting aside the absence of observable abnormalities, Canter himself reported that he was experiencing some improvement. As of July 2017, neither CNP Jackson nor any physician indicated in their medical notes that Canter should continue to refrain from working.

Perhaps this litigation could have been averted if Sedgwick had done a better job of drawing out this context when it communicated its denial to Canter. But improvement is almost always possible in the real world. The explanation in Sedgwick's denial letter, which referred not only to the general absence of "objective" abnormalities but also to the July 3 medical notes and the positive changes in Canter's reported symptoms, contained enough information to provide Canter with an opportunity for full and fair review. The letter

denying Canter's appeal furnished additional details, which also support the substantive reasonableness of Sedgwick's decision—a point not relevant to administrative review, but notable at this stage.

In addition to raising these points of adverse evidence, Canter argues that Sedgwick's determination was based on a misunderstanding of his job duties. Sedgwick's first independent medical reviewer, Dr. Duvall, concluded that Canter was capable of "lifting, driving, bending, and stooping" as part of his normal job duties, but he made no mention of "climbing." This oversight was troubling, the district court thought, because Canter's apparent inability to climb was the reason why disability benefits were granted in the first place. But we agree with the district court that this omission was cured during Sedgwick's internal appeal, in which Dr. Friedman and Dr. Jiva each explicitly touched on "climbing" in their reports. This situation does not strike us as the kind of "after-the-fact" approach we rejected in *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 577 (7th Cir. 2006). Here, the three reviewers each reached the same conclusion on a record that is overwhelmingly one-sided. This makes it unlikely that Dr. Duvall's omission was meant to communicate anything. (Regrettably, the district court added to the confusion when, after describing the omitted job duty as "climbing" throughout its analysis of this issue, it said "driving" instead of "climbing" in the final sentence of the relevant passage. In context, this was a simple misstatement.)

## B

Canter also argues that the district court was wrong to reject two items of evidence as outside the administrative record. The first concerns the limited efforts the reviewers

undertook to contact Canter's providers, and the second relates to the leave-of-absence accommodation AT&T granted him in February 2018. We typically review decisions to admit or exclude evidence for an abuse of discretion, though we take a *de novo* look when such a decision turns on a question of law. *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1266 (7th Cir. 1988). In this case, we apply the *de novo* standard, because the question is whether the district court correctly applied ERISA when it defined the contours of an administrative record and the review of evidence outside that record.

When determining whether an administrator's decision was arbitrary and capricious, we generally restrict ourselves to the evidence that was before the administrator when it made its decision. *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 462 (7th Cir. 2001); *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981–82 (7th Cir. 1999). In many ways, the structure of judicial review in the ERISA context parallels review under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, where discovery is similarly constrained for a parallel set of reasons. See *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (limiting judicial review to the administrative record compiled before the agency, subject to limited exceptions). But we also have recognized that a court may look beyond what was before the plan administrator if the record appears incomplete, internally contradictory, or suggestive of bad faith. See, *e.g.*, *Hess*, 274 F.3d at 462 (considering a contract that was not itself in the record but that had been explicitly referred to in record evidence); *Perlman*, 195 F.3d at 982 ("[D]iscovery may be appropriate to investigate a claim that the plan's administrator did not do what it said it did—that, for example, the application was thrown in the trash rather than evaluated on the

merits … ."). Nothing in this record indicates that these narrow exceptions apply here.

Dr. Duvall's report shows that she made a single attempt to reach CNP Jackson before finalizing her report later the same day. Dr. Jiva's report states that he spoke with Dr. Kellar but did not contact Canter's other providers. And Dr. Friedman's report documents that he attempted once to reach CNP Jackson and twice to reach Dr. Bang, though the attempts were unsuccessful. These facts were before the Plan administrator and thus there is no reason why the court could not consider them. Evidence of CNP Jackson's and Dr. Bang's attempts to return Dr. Friedman's calls, though not mentioned in Dr. Friedman's report and therefore perhaps technically beyond the administrative record, provides additional relevant context. But after expressing its doubts about the record, the district court went on to explain why it thought that the reviewers did not act unreasonably. Any error in this respect was thus harmless.

Canter also argues that the district court erred in disregarding the fact that Sedgwick recommended in February 2018, and AT&T then approved, his job-accommodation request for unpaid time off retroactive to July 2017. In Canter's view, AT&T's decision to grant a job accommodation after the October 2017 denial of the disability appeal calls the earlier determination into question. But the job accommodation does not raise any suspicion of duplicity or bad faith, and so the district court was correct not to consider it. We are also mindful of the risks of viewing a later accommodation in an adverse light, as this could discourage plans and employers from providing accommodations and other forms of support after the denial of a benefit. (Indeed, Rule 407 of the Federal

Rules of Evidence limits the admissibility of "subsequent re-
medial measures" in tort litigation for similar reasons.)

In any event, even if the job-accommodation evidence
should have been considered, it would not have undermined
Sedgwick's disability decision. The Plan's standards for disa-
bility-benefit and job-accommodation determinations may re-
semble one another, but they are not identical, and so differ-
ent conclusions are to be expected from time to time. Moreo-
ver, the job-accommodation standard reflects the "reasonable
accommodations" requirement of the Americans with Disa-
bilities Act. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685,
692–93 (7th Cir. 1998). It operates against a legal backdrop
quite different from the one that applies to disability-benefits
determinations. We therefore reject the notion that the accom-
modation reflects negatively on the earlier disability decision.

## III

When the district court found for AT&T and the Plan, it
awarded costs pursuant to 28 U.S.C. § 1920 that included $181
for AT&T's counsel's *pro hac vice* admission fees and $2,309.80
in fees for deposition transcripts. Canter has objected to both.
While we review the amount awarded for abuse of discretion,
we consider *de novo* the question whether the district court has
the legal authority to award such costs in the first place. *Mi-
crometl Corp. v. Tranzact Technologies, Inc.*, 656 F.3d 467, 470
(7th Cir. 2011).

We see no problem with the award of costs for the deposi-
tion transcripts, which were cited throughout Canter's sum-
mary judgment materials and are taxed routinely. See, *e.g.*,
*Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 945 (7th Cir.
1997). But we conclude that fees for *pro hac vice* admission are

not taxable in light of the Supreme Court's decision in *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 573 (2012). *Taniguchi* emphasized that section 1920 must be narrowly construed. In so ruling, we align ourselves with the Ninth Circuit, which came to the same conclusion with respect to *pro hac vice* fees in *Kalitta Air L.L.C. v. Central Texas Airborne System Inc.*, 741 F.3d 955 (9th Cir. 2013). We recognize, as *Kalitta* did, that our earlier decision in *United States ex rel. Gear v. Emergency Med. Ass'ns of Illinois, Inc.*, 436 F.3d 726, 730 (7th Cir. 2006), must be set aside in this respect, as it offered no reason for awarding *pro hac vice* fees and did not survive *Taniguchi*.

Federal Rule of Civil Procedure 54(d) says that "costs" generally should be awarded to the prevailing party in a civil action, and section 1920 provides a list of what costs are taxable pursuant to that rule. In *Taniguchi*, the Supreme Court held that the expenses of interpreters are not "costs" for purposes of section 1920(6). It noted that "[t]axable costs are limited to relatively minor, incidental expenses" and "almost always amount to less than the successful litigant's total expenses in connection with a lawsuit." 566 U.S. at 573.

As *Kalitta* held, applying that guidance, *pro hac vice* fees are too distinct from the six kinds of costs enumerated in section 1920 to fall under the statute. The closest analogs are the "[f]ees of the clerk and marshal," see § 1920(1); the other subsections relate to material expenses, like costs of printing and court-appointed experts, arising in the course of litigation. "Fees of the clerk" recalls 28 U.S.C. § 1914, which permits the collection of filing fees and "such additional fees only as are prescribed by the Judicial Conference of the United States." The Judicial Conference's fee schedule refers only to a $188 fee for "original admission of attorneys to practice." 28 U.S.C.

§ 1914, District Court Miscellaneous Fee Schedule #10. And "[o]riginal admission" is quite different from the short-term character of *pro hac vice* status. We therefore now hold that *pro hac vice* fees are not taxable "costs," and reverse the district court's decision to award the $181 to the defendants.

**IV**

In summary, we AFFIRM the district court's grant of summary judgment in favor of AT&T and the Plan, as well as the award of $2,309.80 in fees for deposition transcripts. We RE-VERSE the award of $181 in *pro hac vice* fees and REMAND the case for further proceedings consistent with this opinion.